IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA NELSON-McGOURTY,    )
   )
      Plaintiff,    )
   )
      v.    )     Case No. 08-cv-2849
   )
L & P FINANCIAL ADJUSTERS    )
INCORPORATED d/b/a    )     Magistrate Judge Cole
LOU HARRIS & CO.,    )
   )
      Defendant.    )

## MEMORANDUM OPINION AND ORDER

## I.

## INTRODUCTION

This case arises out of an admittedly brief telephone conversation on April 8, 2008 between the Plaintiff, Patricia Nelson-McGourty, and L & P Financial Adjusters, Inc. ("L & P"), a bill collection agency doing business as Lou Harris & Co. Ms. Nelson, who is suing L & P for its claimed violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA") and the Illinois Workers' Compensation Act, 820 ILCS 305 *et seq.* ("IWCA"), has alleged that during that call, Matt Michell – one of L & P's employees and the son of L & P's owner, Allan Michell – engaged in abusive debt collection practices concerning a debt that had been turned over to L & P for collection.[1]

Ms. Nelson has described the Defendant's conduct as "abhorrent" and "appalling." She contends that despite the brevity of the call, the Defendant "still found the time" to "falsely,

---

[1] Jurisdiction over Ms. Nelson's Illinois Workers' Compensation Act claim exists pursuant to 28 U.S.C. § 1367.

deceptively, and misleadingly" tell her she had to pay a $224 bill even though she informed him that it was covered by her workers' compensation claim and that she was represented by counsel. Ms. Nelson is adamant that the Defendant accused her of "lying," "belittle[d] her," "laugh[ed] at her," "ignored" her assertions regarding her claim and her representation by counsel, "refused to believe her," and "repeatedly demanded payment from" her. (*Plaintiff's Post-Trial Memorandum at 5, 13-15, 25 15*). If true, the charges are serious and compensable both in statutory damages and by an award of costs and reasonable attorney's fees. 15 U.S.C. § 1692k.

Of course, L & P's polar position is that Ms. Nelson's version of the call is false, and that all Mr. Michell did was to ask Ms. Nelson for her attorney's contact information, which she declined to give, stating that she would have her attorney contact L & P. L & P is adamant that its agent never mocked her or continued to demand payment, and that his conduct complied with L & P's protocols for the collection of debts relating to workers' compensation claims and with the requirements of the FDCPA. If this account is to be credited, L & P did not violate either the FDCPA or the IWCA.

I conducted a bench trial between March 22 and March 24, 2010. The parties disagreed about every relevant fact pertaining to the phone conversation, seemingly setting up a classic "he said, she said" debate. But determining which of two, clashing versions of an event is the more credible is not an uncommon feature of trials and almost always involves evidence beyond the partisan testimony of the parties. It is to those attendant circumstances to which one may look to determine which of the conflicting versions of the conversation is the more plausible. *United States v. Jones*, _F.3d_, 2010 WL 2977311 at 2 (7th Cir. 2010)("Therefore, we examine only whether the district court's account of facts is plausible in light of the record viewed in its entirety."). *Cf. United States v. Weigel*, 88 Fed.Appx. 134, 136-137 (7th Cir. 2004).

2

But even where there is little more than the witnesses' competing versions of events, a trial judge can make a finding based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence. Indeed, such a finding, if not internally inconsistent, can virtually never be clear error. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575-576 (1985); *Jones*, 2010 WL 2977311 at 2 ("'[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'").

## II.

### THE FACTORS IN DETERMINING CREDIBILITY
### AND
### THE EVIDENCE AT TRIAL [2]

#### A.

In gauging the truth of conflicting evidence, the trier of fact "has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity." *Weiler v. United States*, 323 U.S. 606, 608 (1945). An important component of any credibility determination is demeanor. *Cf. United Statesa v. Carraway*, _F.3d_, 2010 WL 2813642 at *3 (7th Cir, 2010). "The demeanor of a witness 'may satisfy the tribunal not only that the witness' testimony is not true but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.'" *NLRB v. Walton*

---

[2] This Memorandum Opinion and Order will serve as the Findings of Fact and Conclusions of Law under Fed. R. Civ. P. 52(a)(1).

*Mfg. Co.*, 369 U.S. 404, 408 (1962). *See also Anderson*, 470 U.S. at 575; *United States v. Biggs*, 491 F.3d 616 (7th Cir. 2007); *Thornton v. Snyder*, 428 F.3d 690, 699 (7th Cir.2005)(*en banc*).

Still, there is a good deal of truth in the idea that judges fool themselves if they think they can infer sincerity from rhetoric and demeanor and "weepy" performances. *United States v. Wells*, 154 F.3d 412, 414 (7th Cir. 1998)(Posner, C.J.). *See also Mitondo v. Mukasey*, 523 F.3d 784, 788-789 (7th Cir. 2008)("The belief that many people form from watching television and movies-that this can be done by careful attention to a witness's demeanor-has been tested and rejected by social scientists. Looking for mannerisms, hesitations, and perspiration is the method of the lie detector without the polygraph machine.").

Thus, beyond demeanor – and generally of greater importance in attempting to separate truth from a tale spun for the occasion -- are the implausibility of testimony, the shifting and vacillating explanations for conduct, uncertain and inconsistent memories, the inconsistencies between testimony and objective evidence, the internal inconsistencies within testimony, and the extent to which documents or objective evidence may contradict the witness' story. *See Anderson*, 470 U.S. at 574-75; *Mitondo*, 523 F.3d at 788; *United States v. Bradoford*, 499 F.3d 910, 920-21 (8th Cir. 2007); *Kadia v. Gonzales*, 501 F.3d 817, 820 (7[th]Cir. 2007); *Pinpoint, Inc. v. Amazon.Com, Inc.*, 347 F.Supp.2d 579, 583 (N.D. Ill. 2004) (Posner, J.)(sitting by designation).

## B.
### 1.

The agreed upon facts are few and may be quickly summarized. In 2006, Ms. Nelson suffered a work-related injury after she tripped over a patron's coat while waitressing at The Great Escape Restaurant in Schiller Park, IL. (*Trial Transcript 33*)("*Tr.*"). After being treated for shoulder injuries in the emergency room at Gottleib Memorial Hospital, Ms. Nelson was

4

referred to an orthopedic specialist for an MRI, which was also performed at Gottleib by the Midwest Institute for Minimally Invasive Therapies, ("MIMIT"), the entity which does MRI services for Gottleib Hospital. At the time, Ms. Nelson believed that the bill for the MRI was owed to Gottlieb – it was in fact owed to MIMIT -- and had been paid in full. In fact, there remained an additional $224 owed to MIMIT, of which she testified she was unaware. *(Tr. 35-36)*.

The outstanding bill was turned over by MIMIT to L & P for collection, and on March 21, 2007, L & P mailed a written notice of the debt to Ms. Nelson's residence. *(Agreed Findings of Fact 1)("AFF.")*. Ms. Nelson never responded to the letter, although she testified that, because she was "getting bombarded by bills," she had no specific recollection of ever receiving the L & P bill. *(Tr. 71)*. On April 2, 2008, more than a year later, L & P mailed a second notice/bill, apprising Ms. Nelson of the $224 debt to "MIMIT," (the acronym was not explained) and encouraging swift payment. *(Plaintiff's Ex. H)*.[3] Ms. Nelson did not recognize the name "MIMIT," and, on April 8, she telephoned L & P to inquire about the bill. She spoke to Matt Michell, who asked for the account number listed on the bill. It is here that the parties' stories diverge completely. *(AFF. 2)* We begin with Ms. Nelson's version of events.

Ms. Nelson testified that Mr. Michell informed her that the money was owed to Gottleib Hospital, which she then recognized as the hospital where she received treatment for her 2006 workplace injury. She told Mr. Michell that the debt related to a workers' compensation case, and that "it was being taken care of." *(Tr. 37)*. According to Ms. Nelson, Mr. Michell responded by laughing at her and stating, "that's impossible." *(Id.)*. Ms. Nelson repeated that she had a pending workers' compensation case, but Mr. Michell continued to insist that she owed $224,

---

[3] No claim is made that this letter was improper.

5

telling her, "you have to pay it." After the conversation continued back and forth in what she described as a "childish" manner, Ms. Nelson finally said, "I have an attorney. Would you like his name?" Ms. Nelson was adamant that Mr. Michell ignored her question, again demanding: "you have to pay the bill." (*Tr. 38, 48*). (This testimony was contradicted by her own testimony on redirect that she in fact gave him her lawyer's name, which he ignored. (*Tr. 83*)). The conversation continued in this hectoring manner, she claimed, with Ms. Nelson repeating that she had a workers' compensation case and Mr. Michell stating that she did not. Ms. Nelson said she finally hung up on Mr. Michell, feeling "irate, upset, mad…[and] indignant" because he had "insinuated" she was a "liar." *(Tr. 38-39, 65, 73)*.

Significantly, Ms. Nelson, did not testify on direct examination – she was not asked -- that after this conversation she called anyone at Horwitz, Horwitz & Associates, the firm handling her workers' compensation case (and her counsel in this case) to report on what had transpired. She did say, however, that eight days later, on April 16, she faxed a handwritten letter addressed to "Anna," a non-lawyer assistant at the Horwitz firm, along with copies of her credit report and the April 2 bill she had received from L & P. (*Tr. 80; Plaintiff's Ex. 2-3*). In that letter, Ms. Nelson detailed all manner of concerns about her situation and her law firm's handling of her pending workers' compensation case. (*Plaintiff's Ex. 2*).

Displaying not the slightest bit of anger, rage, or indignation – the emotions Ms. Nelson said she was feeling when she got off the phone and which she was still feeling when she wrote her letter – she wrote: "please explain to me why Workers' Comp refused paying for my treatment. Also why I was constantly in conflict for my medical problems?" She goes on to say, "from my understanding workers' comp is supposed to pay 100% medical pertaining to my

accident. According to the hospital (Gottlieb) I had to pay $1,641.24 back in April or May of 2005." (Parenthesis in original).

The letter goes on to say that during this time, Ms. Nelson had to put out $1,000 for an MRI that workers' comp refused to pay, and now, two years later, she lamented, her credit report had again been "trashed" because workers' compensation refused to pay. She said that she had to use her credit cards to make payments and when she tried to transfer the amount off of a Bank of America card to another card with lower interest rates, she was refused because of her "bad credit report." When she called to find out what happened, she was told that it was back for a lack of payment. She said that it was "something to do with workers' comp." Evidencing some knowledge of the law, Ms. Nelson said: "Why was I refused my rights by workers' comp law," and hoping that there might be legal recourse, Ms. Nelson asked why couldn't they "be held accounted [sic] for all of this mess they caused me? I need my credit report back in good standing. Thank you. Patricia Nelson-McGourty." (*Plaintiff's Ex. 2; TR 43-44*).

Then, in the very bottom left-hand corner of the letter in hand printing, there is a "PS" that says that the debt collector did not believe that she had a workers' compensation case.[4] Significantly, the note says nothing about Mr. Michell laughing at her, mocking her, belittling her, demanding that she pay even though she told him that it was a workers' compensation case, or refusing to take the name of her lawyer despite her offer to provide it.

At the close of Ms. Nelson's direct examination, counsel for the Plaintiff offered this letter as a "prior consistent statement." (*Tr. 45-46*). Curiously, he contended that he was not

---

[4] The Defendant's Post-Trial Memorandum (at 5) seems to hint at some impropriety based upon the fact that the letter is written in long hand and the only reference to the conversation with Mr. Michell – the "PS" -- is hand printed. Given my assessment of Ms. Nelson's credibility, I need not pursue the point, which, being undeveloped and unexplained, is forfeited. *White Eagle Co-opinion Ass'n v. Conner*, 553 F.3d 467, 476 n. 6 (7th Cir. 2009).

offering the letter for the truth of the matter asserted but merely for the fact that Ms. Nelson had

written the letter. (*Tr. 45*). But if the letter was not being offered for the truth of the matters

asserted – and it could not at that point pursuant to Rule 801(d)(1)(B), Federal Rules of Evidence

-- it was not relevant and was inadmissible *on direct examination* under the doctrine of prior

consistent statements even to corroborate Ms. Nelson's story. I thus denied its admission. (*Tr

46-47*).

Prior consistencies are inadmissible on direct examination, since a prior consistent

statement "must meet at least the standard of having some rebutting force beyond the mere fact

that the witness has repeated on a prior occasion a statement consistent with his trial testimony."

*United States v. Simonelli*, 237 F.3d 19, 27 (1st Cir. 2001) (internal citations omitted).

Admissibility of a prior consistent statement for substantive purposes as non-hearsay pursuant to

Rule 801(d)(1)(B) requires that the statement be consistent with the declarant's testimony,

offered to rebut an express or implied charge of recent fabrication or improper influence or

motive, and that the declarant testify at trial and is subject to cross-examination. *See Tome v.

United States*, 513 U.S. 150 (1995).[5] The Rule, however, does not deal with a prior consistent

statement that is offered on redirect for the non-substantive purpose of rehabilitating a witness by

showing that the witness had said the same thing on an earlier occasion.

There are several categories of prior consistent statements that can rehabilitate a witness

in different ways, including statements (a) placing a claimed inconsistent statement in context;

(b) showing that an inconsistent statement was not made; (c) indicating that the witness' memory

is not as faulty as a cross-examiner has claimed; and (d) showing that the witness did not

---

[5] The reason for the Rule's retention of the common law's requirement that the prior consistent statement antedate a motive to falsify is that otherwise the statement is not relevant to rebut the charge that the in-court testimony was the product of the declarant's motive to lie. *Tome,* 513 U.S. at 156.

recently fabricate his testimony as a result of an improper influence or motive. *See United States v. Rubin,* 609 F.2d 51, 68, 70(2nd Cir. 1979)(Friendly, J., concurring)(Prior consistent statements for rehabilitation should be allowed where they bear upon whether, "looking at the whole picture, there was any real inconsistency.").

**2.**

On cross-examination Ms. Nelson said that after hanging up on Mr. Michell, she telephoned 411 for the number of Gottlieb Hospital, whose relationship to the bill Mr. Michell had explained. She confirmed that the $224 charge related to an outstanding bill from her 2006 MRI. *(Tr. 75)*. Although there had been no mention on direct examination of any call to her law firm on April 8 following her conversation with Mr. Michell, Ms. Nelson claimed on cross-examination that she had called Anna at the Horwitz firm on the 8th to report what had happened during the phone call. She said she was "still raging" from her conversation with Mr. Michell, and that she told Anna how he laughed at her and explained how she had been treated. *(Tr. 76, 84-86)*. There was no objection by Plaintiff's counsel to these questions. *(Tr. 74-76)*.

Following Ms. Nelson's impeachment on cross-examination that called into question her memory and her motivation, Plaintiff's counsel again sought to introduce the letter because, he argued, it corroborated her version of the telephone call with Mr. Michell. I admitted the letter under the doctrine of prior consistent statements. *(Tr. 80)*. But ironically, as discussed below, the letter is more significant for what it omits than for what it says and tends to impeach more than corroborate Ms. Nelson's version of events.

Ms. Nelson's letter to Anna, faxed eight days after the Michell conversation, reveals a long history of unpaid debts, and one may therefore reasonably assume some past involvement with debt collectors. Her demeanor on the stand was that of a forceful and determined woman,

and who by her own account could not be bullied. She testified that she was still "mad" about the phone conversation when she wrote her letter. (*Tr. 40*). Indeed, she said she was "raging." (*Tr. 85*). She wrote the letter, she said, because despite her alleged explanation to Anna on the phone on April 8 of how Mr. Michell treated her, she had heard nothing back from the Horwitz law firm. (*Tr. 84*).

In determining whether the "PS" is merely an adumbration rather than a complete account of Mr. Michell's behavior (and thus impeaching of Ms. Nelson's trial testimony), the context in which the letter was written cannot be ignored, for "the character of every act depends on the circumstances in which it is done." *Schenck v. United States*, 249 U.S. 47 (1919)(Holmes, J.). The content and tone of the "PS" are not what one would reasonably expect from a person so sorely abused as Ms. Nelson claims she was. Ms. Nelson, according to her testimony and to her Post-Trial Memorandum, was incensed at the "abusive," "abhorrent," "appalling," "belittle[ing]," and "mocking" behavior of Mr. Michell. And yet, there is not the slightest hint of the rage she claimed she experienced as a consequence of her encounter with Mr. Michell. All there is is a matter of fact statement that Mr. Michell did not believe that the debt stemmed from a workers' compensation case – a conclusion to which she could well have come simply based upon his request for her lawyer's name and what she described as his "argumentative" and "rude" attitude. (*Tr. 62*).

"[U]nder a realistic appraisal of psychological tendencies and human weakness," *Withrow v. Larkin*, 421 U.S. 35, 47 (1975), it is at least curious that had the conversation occurred as related by Ms. Nelson and given the claimed intensity of her anger at her supposed treatment by Mr. Michell, the letter would have been written as it was. Given that confluence of factors, one reasonably would expect the letter to have contained some reference to Mr. Michell

10

having laughed at her, repeatedly said, "that's impossible," etc. The terse "PS" conveys nothing like that. An expression of doubt or a refusal uncritically to accept a debtor's representation is a far cry from the kind of conduct attributed to Mr. Michell by Ms. Nelson at trial and with which the FDCPA concerns itself.

Her failure to have included any of those facets of his allegedly squalid conduct at least tends to undercut her testimony under the well known principle of impeachment by omission: the failure to mention a material circumstance in a prior statement, where it would have been natural to mention it in the statement, has the effect of diminishing a witness' credibility under the theory. *United States v. Useni*, 516 F.3d 634, 652 (7th Cir. 2008).

**3.**

Ms. Nelson's Post-Trial Memorandum argues that any omissions in the letter are understandable, as she had run out of space and, moreover, knew nothing about the FDCPA, making it impossible for her to have known that the omitted information about Mr. Michell's behavior would be significant for making out a claim under the Act. It is the Plaintiff's further submission that Mr. Michell's alleged misconduct during the call was irrelevant to her workers' compensation case and thus there was no reason for Ms. Nelson to have reported anything more to her lawyers than she did. Indeed, the Memorandum contends that it would have been unreasonable for her to have included anything else since those details were "peripheral to the information she needed to convey to her attorney, i.e., her employer's workers' compensation insurance carrier again failed to pay her bills." (*Id.* at 18).

That she supposedly ran out of space at the bottom of the letter (*Tr. 88*) does not reasonably account for the abbreviated content of the "PS." When one looks at the letter

(*Plaintiff's Ex. 2*) it is apparent that there is enough space at the bottom of the page in which she could have said something along the lines of: "The L & P guy kept laughing at me and wouldn't even take your name." And there was nothing to have prevented Ms. Nelson from going on to a second page and amplifying on her claimed mistreatment by Mr. Michell.

It is no answer to say that Ms. Nelson did not know about the FDCPA, as she claimed at trial, for her knowledge of the Act is not particularly helpful in evaluating how someone in her situation would reasonably have reacted to the mistreatment she claims she suffered. The question is not Ms. Nelson's ability to assess the conversation from the perspective of a lawyer analyzing the elements of a potential claim, but how a reasonable person who had been treated in the way Ms. Nelson contends she was would have responded in a letter to her lawyers. The answer to that question has nothing to do with knowledge of a federal statute, but rather, depends on a realistic appraisal of psychological tendencies and human reactions. [6]

It is unpersuasive to suggest that the statement of Mr. Michell's disbelief about Ms. Nelson having a workers' compensation case was relevant to "her employer's workers' compensation insurance carrier again [having] failed to pay her bills," but that the other details relating to the identical subject were merely "peripheral" to that topic. Indeed, the omitted details were part of an inseparable whole, and what was included in the "PS" was no more significant than what was omitted. In fact, whether Mr. Michell believed she had a workers'

---

[6] The Post-Trial Memorandum argues that Ms. Nelson had no motivation to lie since her statutory damages were capped at $1000. (*Plaintiff's Memorandum at 17*). But statutory damages in many cases are capped at small amounts, and there are plaintiffs aplenty who have brought frivolous and fraudulent suits. Be that as it may, for what the Post-Trial Memorandum notes are three days of effort (*id.* at 17; i.e. the deposition and 2 trial days), Ms. Nelson stood to make $1000. These were not 8 hour days, but if they were, that would translate into $333.33 per day. One may fairly assume that that amount corresponded and may have exceeded what Ms. Nelson earned as a waitress in Schiller Park. (*Tr. 33*). On an hourly basis that is more than $40 per hour for an 8 hour day, which exceeds the hourly pay of a courtroom deputy in this court or even a judicial assistant at a JSP grade 11. And if that is not sufficient motivation to stretch the truth, the rage felt by Ms. Nelson towards L & P for even calling her about a worker's compensation case provides ample motivation.

compensation case or not was irrelevant to the fact that workers' compensation had not paid the $224 bill. It was the failure of workers compensation to cover the debt, not a debt collector's subjective belief of whether the bill should have been covered that counted.

Finally, there is a real-world consideration that undercuts the notion that Ms. Nelson's "PS" said all that was needed, and that her credibility should not be affected regardless of the omission of critical parts of the conversation in her letter. So far as Ms. Nelson knew, Mr. Michell could be calling again, perhaps at ungodly hours, and demanding payment. She was, as she said, being "bombarded by bills" from all sides. Indeed, if Mr. Michell was as reprehensible as she claimed, he might very well have been calling again – and soon. What was most urgent was that she communicate with her lawyers how she had been treated so that they could take immediate steps to get him off her back. One would have expected more rather than less about the conversation with Mr. Michell in the letter (even if she had to go on to a second page).

In her letter, she inquired about the possibility of holding the hospital accountable for continuing to bill her. That was a minor inconvenience compared to the threat posed by Mr. Michell. And yet, the "PS" does not begin to convey what she says occurred during her conversation with Mr. Michell. I am not persuaded that this was an oversight. Rather, I conclude that the "PS" stated effectively all that had occurred, and that was that Ms. Nelson had concluded that Mr. Michell did not believe she had a workers' compensation case. But that, without more, is not a violation of the FDCPA. I do not credit her testimony that Mr. Michell laughed at her, mocked her, repeatedly said "that's impossible," and refused to take her lawyer's name, which she claimed she was prepared to give him had only he been interested.

**4.**

After Ms. Nelson's credibility was called into question on cross-examination, and the letter to Anna was admitted, it is noteworthy that Anna was not called as a witness by Ms. Nelson to confirm her claim on cross-examination that she explained what had occurred to Anna following her conversation with Mr. Michell. This conversation was as much a prior consistent statement as was the letter. Indeed, given the abbreviated nature of the "PS" in the letter, Anna may have been far more persuasive than the letter itself.[7] And of course, Ms. Nelson's claim that she had made a prior consistent statement, without confirmation from Anna, was no more persuasive than her testimony regarding the telephone call, itself.

When a party fails to produce a witness peculiarly available to them, and whose testimony would shed light on an event, an inference arises that the testimony, if produced, would have been unfavorable. *Graves v. United States*, 150 U.S. 118 (1893); *Oxman v. WLS-TV*, 12 F.3d 652, 661 (7th Cir. 1993). An argument could certainly be made that as an employee of Ms. Nelson's counsel, Anna had the type of relationship with Ms. Nelson that "pragmatically render[ed her] testimony unavailable to" L & P. *Littlefield v. McGuffey*, 954 F.2d 1337, 1346 - 1347 (7th Cir. 1992). *See also Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir. 1983). But L & P had the power to subpoena Anna and thus it could be argued that Anna was not peculiarly in the power of Ms. Nelson to produce. *Advocate South Suburban Hosp. v. N.L.R.B.*, 468 F.3d 1038, 1049 (7th Cir. 2006). The issue, however, has not been raised by L & P, and so we move on.

---

[7] Either the declarant or the auditor is a competent witness to relate the prior consistent statement. *See United States v. Green*, 258 F.3d 683 (7th Cir. 2001).

In addition to omissions in her April 16 letter, Ms. Nelson's credibility was called into question in other ways. Most notable was her trial testimony that *she* telephoned L & P, which flatly contradicted her deposition testimony, in which she insisted literally twelve times that it was *L & P* that called her, and that she had not even read L & P's April 2 collection notice until after the April 8 phone call. *(Tr. 57)*. These disparities are by no means insignificant, as the Post-Trial Memorandum argues, for in a case that turns on differing versions of a brief phone call, such inconsistencies bear on the determination of the reliability of the witness's memory of the event. And memory, of course, is an important component of the weight to be accorded a witness' testimony. *See Peters v. Hobby,* 349 U.S. 331, 351 (1955) ("Their whispered confidences might turn out to be yarns conceived by twisted minds or by people who, though sincere, have poor faculties of observation and memory"); *Rodriguez v. Peters*, 63 F.3d 546, 556 (7th Cir. 1995)("Where a witness first identifies the defendant at trial, defense counsel may test the perceptions, memory and bias of the witness, contemporaneously exposing weaknesses and adding perspective in order to lessen the hazards of undue weight or mistake."). *See also Kray v. Stewart*, 2010 WL 1417918, 2 (9th Cir. 2010)("Kray was able to establish on cross-examination that the police officers' memories of who fired the first shot were inconsistent with each other and with their own prior statements.").

At trial, Ms. Nelson was certain that *she* had called L & P. And she had. Yet, she testified literally 12 times at the deposition that *Mr. Michell* had called her and that she had not even read the April 2 letter from L & P until after the phone call. At trial she said she placed the call to Mr. Michell in response to the April 2 letter. *(Tr. 57, et seq.)*. All of this proves that "certitude is not the test of certainty," Holmes, Natural Law, 32 Harv. L.Rev. 40, 41 (1918), that

memory is fallible, and that people often recall things that are not so. *United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009). "Memory often plays tricks.... People may remember what they want to remember, whether it happened or not, and the lack of correlation between the strength and accuracy of one's recollection is one of the most important findings of the psychology of memory.... ([Plaintiff] also had a greater personal stake and thus a greater likelihood that his memory would conform to his self-interest rather than actual events." *Jarad v. Gonzales*, 461 F.3d 867, 870 (7th Cir. 2006)(parenthesis in original).

When confronted with the glaring disparity between her deposition and her trial testimony, Ms. Nelson claimed that she was so "perturbed" by the phone conversation that she had mistakenly jumbled the sequence of events when describing the call at her deposition. *(Tr. 66; See also Tr. 48-49)*. This attempted explanation, however, is singularly unconvincing. In the first place, Ms. Nelson's deposition took place in October 2009, approximately a year and a half after the phone call. *(Tr. 66)*. It seems doubtful that she would not have "cooled down" enough by then so as to properly recall the sequence of events.

Second, it is undisputed that Ms. Nelson had the opportunity to correct any errors in her deposition prior to trial. She conceded that she received a copy of her deposition in the mail from her lawyers, and that she was to review it for mistakes. Yet, she claimed that she did not review it because she merely "peeked" in the envelope, but did not take the deposition out to read. *(Tr. 78-79)*. This odd testimony was accompanied by Ms. Nelson showing me how she partially opened a corner of the envelope and "peeked" in. Why she did this, but did not take the transcript out of the envelope, she could not explain. The demeanor that accompanied this testimony was halting and evasive and I find her explanation contrived. While the doctrine of *falsus in uno, falsus in omnibus,* if it ever had any vitality, has none today, a witness's falsehoods

16

and evasions under oath during trial can affect the assessment of other portions of the witness' testimony. *Kadia v. Gonzales,* 501 F.3d 817, 821 (7th Cir. 2007).

The Plaintiff's complaint alleges that Ms. Nelson called L & P. So either Ms. Nelson changed her story at her deposition – as the Defendant argued she did to make the Defendant's conduct look more oppressive – or her memory is less than reliable as to events which are now at the crux of the case. In either event, these are matters that bear upon credibility, and the Plaintiff's contention, that whether she or the Defendant placed the call is irrelevant, is incorrect. (*Plaintiff's Memorandum at 17-18*).[8]

Ms. Nelson, at her deposition, was as certain that L & P had called her as she was at trial that Mr. Michell had mistreated her on the phone. If her memory of the former was seriously flawed, as it was, so too may be her memory of what was said during the conversation. There is actual proof in the form of the inconsistency in her trial testimony regarding an aspect of the phone call. On one hand Ms. Nelson was insistent that Mr. Michell refused her offer to provide the name of her lawyer and kept demanding payment and telling her that it was impossible that she had a workers' compensation case. But she also said that, in fact she had given him her lawyer's name. (*Tr. 83*).

If she intentionally misstated the various facets of the call, the lethality of the effect on her credibility is obvious. But I need not resolve that issue. It is enough to say that "[a] witness who at different times gives different versions of the same transaction, and blows hot or cold as [her] interest in the particular litigation may require, can scarcely complain if the court fail [sic]

---

[8] The Plaintiff's Post-Trial Memorandum argues that Ms. Nelson had no motivation and no capacity to fabricate the facts to which she testified, and that she would never have gone through all the grief involved in this case for a maximum recovery of $1,000. Acceptance of that conclusion would create virtually a rule that a Plaintiff in a case involving a violation of a federal statute that prescribes a low minimum recovery would not lie. As Judge Posner said in another context, "enough said."

to give [her] testimony the weight to which it would otherwise be entitled." *Dr. S.A. Richmond Nervine Co. v. Richmond*, 159 U.S. 293, 302 (1895).

**6.**

Mr. Michell's testimony was more credible. Although he did not have an independent, comprehensive memory of the call in its entirety, he testified that after hearing Ms. Nelson's voice again at trial and having looked over the summary of the conversation, which he entered in the company's computer immediately after the call, he was able to recall several details of the conversation. He remembered that when Ms. Nelson called, he could tell by the sound of her tone that she was "upset" that L & P had sent her a collection letter. (*Tr. 371*). This is consistent with Ms. Nelson's admission at trial that "file[d] this lawsuit against L & P Financial," [b]ecause they called me up and they told me that they are Lou Harris Company and that they're a collection agency and I owe money." (*Tr. 58*).

When Ms. Nelson asked him to whom the bill was owed, Mr. Michell stated that the bill was owed to MIMIT, which he explained to her was affiliated with the radiology services at Gottlieb Hospital. (*Tr. 375*).[9] She then told him that the bill was related to a workers' compensation case, and he asked her for her attorney's information. (*Id.*).[10] Ms. Nelson, who could well have taken this as implying disbelief by Mr. Michell, as she stated in her "PS" in her April 8 letter to Anna, responded that she would have her attorney contact L & P. Mr. Michell testified that he also provided her with the number for MIMIT's billing service, which he

---

[9] MIMIT stands for Midwest Institute for Minimally Invasive Therapies.

[10] No claim is made that the request for the identity of Ms. Nelson's lawyer is a violation of the FDCPA.

recalled from memory – 1-800-458-3322 -- so that she or her attorney could contact it with any questions regarding the debt. (*Tr. 376*).[11]

That telephone number appears in Ms. Nelson's handwriting on the L & P bill, on which she had jotted several account and telephone numbers, including the number for Gottleib Hospital, which she said she got from 411. (*Plaintiff's Ex. 3*). Ms. Nelson, however, claimed she could not remember how she got MIMIT's number. (*Tr. 111*). The presence of that number jotted on the bill by Ms. Nelson supports Mr. Michell's testimony that he gave her the number and diminishes the credibility of Ms. Nelson's claim of how Mr. Michell mistreated her. Had Mr. Michell engaged in the conduct attributed to him, he would not have been cooperative and given her MIMIT's telephone number. After all, according to her, his exclusive focus was on trying to force her to pay the bill and in belittling her.

Mr. Michell's version of events is corroborated by his own substantially contemporaneous notes of the conversation, which he entered into L & P's computer debt collection program at the end of his call with Ms. Nelson, in conformity with L & P's company practice requiring its collectors to maintain a written record of all conversations with debtors. (*Tr. 386*). The trial exhibits reflecting the account notes were first presented in the form of typed documents prepared by L & P's owner, Allan Michell, who copied the notes as they appeared on the computer screen manually from L & P's collection software program.[12] He did so because he said he did not, at the time of the discovery request, know how to print a screenshot of the

---

[11] This corresponds to the computer notes that reflect that Mr. Michell "GAVE DTR CLIENT PHONE # FOR HER ATTORNEY."

[12] Allan Michell is Matthew Michell's father. For the purposes of clarity, Allan Michell will be referred to as "Allan."

notes as they actually appeared in the collections program. (*Tr. 294; Defendant's Ex. B, C*). The discovery materials were then put in the form of trial exhibits.

These exhibits list the entire computer field reflecting entries from Ms. Nelson's account in chronological order, all of which were admitted at trial without objection, except for Mr. Michell's note written on April 8, which stated what occurred during the telephone conversation.[13] The April 8 account note, which was written in a kind of shorthand (by Mr. Michell), reads: "DTR CIO [debtor called into office], SAID WORKMANS COMP CASE, ASKED FOR ATTY NAME…SAID WILL HAVE ATTRNEY CONTACT US I ALSO GAVE DTR CLIENT PHONE # FOR HER ATTORNEY." (*Plaintiff's Ex. 6*; *See also Defendant's Ex. B*). I had reserved ruling on the objection until further foundation could be established. (*Tr. 6; Minute Order of 3/18/10*).

During the trial, I requested L & P's counsel to try to print an actual screenshot of the relevant computer fields for purposes of clarity and to further test the witnesses' veracity. When the actual screenshot of Ms. Nelson's account was presented, (*Plaintiff's Ex. 6*), it was rather vigorously emphasized by Plaintiff's counsel that Allan had "altered" the notes when he had typed up the entries (i.e. *Defendant's Ex. B, C*) as they appeared on the computer screen. (*Tr.437-39*). Specifically, it was pointed out that Allan had corrected the misspelling of the word, attorney, in the notes, when, only minutes earlier, he testified that the only changes he had made were formatting edits. (*Tr. 439*).

---

[13] Prior to trial, counsel for the Plaintiff had filed a motion *in limine* to exclude any computer related evidence pertaining to Ms. Nelson's account on hearsay grounds. [35]. The argument was that the computer entries showing activity from the beginning to the end of the account did not qualify under rule 803(6), Federal Rules of Evidence. After hearing on that motion, the Plaintiff withdrew the objection except as to the actual entry of 4/8/10. *See* Minute Order of 3/18/10.

But that inconsistency is not determinative, and I do not find that the correction was an attempt to mislead or to falsify the notes, or that Allan Michell intentionally lied, notwithstanding the accusation in the Post-Trial Memorandum that he had "perjur[ed]" himself. The correction of the misspelling is the only difference between the notes in the computer and Allan's typed version, which he originally prepared for purposes of responding to discovery, and whose accuracy had never been questioned until the trial. In any event, the notes, themselves, as they exist in the computer are time-stamped, and the proof was uncontradicted that the notes could not be deleted or altered after they were entered into the program, and that the timing of entries was determined by the computer and could not be fudged. (*Tr. 201, 400*).

The computer time stamp reflects that Mr. Michell's note of the conversation was entered at 10:26. (Plaintiff's Ex. 6) There was no dispute that this was in fact the time the note was entered and that it could not be changed once entered. Ms. Nelson conceded that she made the call to Mr. Michell "around 10:00, 10:30." (*Tr. 53.*). Thus, by Ms. Nelson's own testimony, her call to L & P corresponds closely with the computer time stamp for the entry of Mr. Michell's note of the conversation.

Plaintiff's counsel again objected to the admissibility of the notes, themselves, on the ground that Mr. Michell had a motive (and opportunity, although brief) to falsify his entries, thus rendering them inadmissible under Rule 803(6), Federal Rules of Evidence. Rule 803(6), which governs the admissibility of the records of a regularly conducted activity as an exception to the hearsay rule, provides that a record, "in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge," is admissible "if kept in the course of a regularly conducted business activity," and "if it was the regular practice of that business activity" to make the record.

It is the regularity of the making of the record that is deemed sufficient to ensure reliability and thereby justify admissibility without cross-examination of the declarant. Where that regularity cannot be shown, the inherent trustworthiness vanishes, and the hearsay rule bars admissibility if the record is offered to show the truth of the matter asserted. Where the records are prepared by a party rather than a clerical or professional employee there may be a strong motive to falsify the records and the district judge may (but is not obligated to) deem them insufficiently trustworthy to be admitted. *See United States v. Spano*, 421 F.3d 599 (7th Cir.2005); *Kikalos v. United States*, 408 F.3d 900, 904 (7th Cir. 2005). For example, in *Lust v. Sealy, Inc.*, 383 F.3d 580 (7th Cir. 2004), a manager created a memorandum for a conversation with an employee explaining that she was fired for reasons of job performance. The court of appeals concluded that the only purpose was to create evidence for use in Lust's anticipated lawsuit, and that purpose disqualified it as a business record.

The concern in this case is that Mr. Michell was in control of the account and the computer entries and falsified the notes of the conversation since he knew he had acted improperly. At the time I admitted the notes of the phone call, I commented that the credibility of the notes was dependent on the credibility of their author. *(See Tr. 449-50)*. After hearing the testimony of Allan and Matt Michell, I admitted the evidence under Rule 803(6).

But even if the April 8th computer entry does not qualify under that Rule as proof of what was said during the conversation, it qualifies under Rule 803(5) as past recollection recorded, since Mr. Michell said the notes, when made, accurately reflected the call, and that he had prior knowledge of the call, but now has insufficient recollection to testify fully. I credit that testimony. The fact that the entry was admitted rather than simply having been read into the record as Rule 803(5) prescribes, does not in the context of this case change the outcome.

It is contended that because L & P collectors work on a quota system and are paid on a commission basis, Mr. Michell did have a motive to continue to attempt to collect the debt after being informed by Ms. Nelson that she was represented by an attorney. (*Plaintiff's Post-Trial Memorandum* 20). Perhaps. But the conclusion that he acted on that motive is less likely than its opposite. L & P stood to gain only a $60.00 commission from collecting the $224 debt. (*Tr. 205; Def. Ex. A*). Although smaller amounts can add up to large sums, it seems foolhardy for even the most venal of bill collectors to risk liability under the FDCPA for such a slight payoff in a case where the debtor announces that she has an uncollectible workers compensation case and offers to provide her attorney's name and number. It is unlikely that Mr. Michell would have intentionally refused Ms. Nelson's claimed offer to give him her lawyer's name and number in pursuit of a $70 payoff when the risk of suit loomed so large.

Mr. Michell was savvy enough to know where there are lawyers there are lawsuits. While the Post-Trial Memorandum seeks to paint Mr. Michell's thirst for money as unquenchable, the evidence was that there were numerous other far less risky sources of satiation. Mr. Michell manages many of L & P's larger accounts, and in dealing with an average of about fifty to one-hundred accounts each day, he had ample opportunity to fill his collections quota, without browbeating a woman who claimed to be represented by counsel and who offered to identify him. (*See Tr. 378*).

As it is "within district judge's discretion to believe or disbelieve testimony based on overall credibility of witness," *Piraino v. International Orientation Resources, Inc.*, 137 F.3d 987 (7th Cir. 1998), I do not credit Ms. Nelson's testimony regarding the April 8 phone call. *See also Anderson*, 470 U.S. at 575; *Torres v. Wis. Dep't of Health & Soc. Servs.*, 838 F.2d 944, 946

(7th Cir. 1988). Ms. Nelson's demeanor and the evidence taken as a whole do not support her version of events. Not only does the interchange she described seem implausible on its face, but sharp discrepancies between her deposition and trial testimony have called into question her veracity and her ability to recall with sufficient accuracy the telephone conversation. I credit Mr. Michell's testimony regarding what was said during the phone conversation.

## III.

### The Plaintiff's FDCPA Claims

The FDCPA aims to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, -- U.S. ---, ---, 130 S.Ct. 1605, 1608, 176 L.Ed.2d 519 (2010). Among other things, the Act prohibits debt collectors from making false, deceptive or misleading representations, or engaging in other abusive, unfair, or unconscionable practices. 15 U.S.C. § 1692d-1692f; *Heintz v. Jenkins*, 514 U.S. 291, 292 (1995); *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 775 (7th 2007). Debt collectors who fail to comply with the FDCPA are subject to civil liability, amounting to the "actual damage" a Plaintiff sustains as a result of such a failure, as well as reasonable attorney's fees and court costs. 15 U.S.C. § 1692k(a)(1).

"A court may also award "additional damages," subject to a statutory cap of $1,000 for individual actions, or, for class actions, "the lesser of $500,000 or 1 per centum of the net worth of the debt collector." *Jerman* at 1608 (citing 15 U.S.C. § 1692k(a)(2)). In deciding whether additional damages are appropriate, the court considers "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional." 15 U.S.C. § 1692k(b).

24

The parties have stipulated that the Plaintiff is a "consumer" as defined by the FDCPA, 15 U.S.C. § 1692a(3); Plaintiff incurred a "debt" as defined by the FDCPA, 15 U.S.C. § 1692a(5); Defendant is a "debt collector" as defined by the FDCPA, 15 U.S.C. § 1692a(6); the April 8, 2008, telephone call between Ms. Nelson and Mr. Michell was a "communication" as defined by 15 U.S.C. § 1692a(2). Therefore, the sole issue for consideration is whether L & P violated the FDCPA. We conclude that they did not.

## A.
## The Section 1692c(a)(2) Claim

15 U.S.C. § 1692c(a)(2) forbids a debt collector from communicating with a consumer in connection with the collection of a debt, "if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address." In contrast with § 1692e, which imposes strict liability on debt collectors, liability under § 1692c(a)(2) turns on the debt collector's actual knowledge. *Randolph v. IMBS, Inc.*, 368 F.3d 726, 730 (7th Cir. 2004).

It is clear that under Mr. Michell's version of events, which I credit, L & P did not violate § 1692c(a)(2). It was agreed at trial that no one at L & P had any knowledge prior to the April 8 phone call that Ms. Nelson was represented by an attorney. The conversation on April 8 ended with Ms. Nelson telling Mr. Michell that she would have her attorney contact L & P, and it is undisputed by the parties that L & P never contacted Ms. Nelson again. While I credit Mr. Michell's testimony, it is with due regard for the fact that he may well have been "argumentative" and "rude," as Ms. Nelson said. (*Tr. 62*). But the FDCPA is not a code of manners or civility any more than is Title VII. Rather, it seeks to eliminate abusive, unfair, or unconscionable practices by debt collectors. It does not require that a debt collector accept at

face value anything said by a debtor and cease all further discussion. And asking a debtor who claims to have an attorney for the attorney's name is neither abusive, unfair or unconscionable.

The plain language of Section 1692c(a)(2) makes clear that a debtor's mere statement that he has a lawyer does not preclude the debtor from asking for the lawyer's identity. The statute is phrased conjunctively and prohibits further communications if the debtor knows the consumer is represented by counsel "and has knowledge of, or can readily ascertain such attorney's name and address." How more readily can that knowledge be acquired than through a simple question to the debtor? In most cases there would appear to be no other way of acquiring the information.

In sum, even if Mr. Michell, *without more*, initially expressed some doubt (whether directly or indirectly by asking her to provide the name of her lawyer) about whether the MIMIT debt was incurred in connection with a workers' compensation case – as reported in Ms. Michell's "PS" in her April 16th letter – he did not as a consequence violate the FDCPA. No argument is raised in this case that L & P violated the Act by asking for the name of Ms. Nelson's lawyer. Quite the contrary, the claim is that L & P refused to allow Ms. Nelson to give that information and continued to badger her and insist that she pay the $224 debt.

## B.
### The Section 1692e Claims

Ms. Nelson next argues that L & P violated the FDCPA by falsely and misleadingly representing that the $224.00 bill had to be paid, even though Mr. Michell was informed by that point that the debt related to a pending workers' compensation case and, thus, did not need to be paid by her. Correspondingly, she claims that L & P's conduct was also deceptive and misleading in creating a false sense of urgency with regards to the collection of the debt. As a further contention under §1692e, Ms. Nelson asserts that, because Mr. Michell knew that she was

not required to pay the bill until after the resolution of her workers' compensation case, L & P violated the Act by misrepresenting the character and legal status of the debt.

Section 1692e and e(10) prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt." Although the Seventh Circuit has not specifically addressed the point, it is widely held that creating a "false sense of urgency" is a deceptive and misleading practice within the meaning of the Act. *Goswami v. American Collections Enterprise, Inc.*, 395 F.3d 225, 228 (5th Cir. 2004); *Schweizer v. Trans Union Corp.*, 136 F.3d 233, 237 (2nd Cir. 1998); *Ozkaya v. Telecheck Services, Inc.*, 982 F.Supp. 578, 584 (N.D. Ill. 1997). Section 1692e(2)(A) likewise makes it a violation for debt collectors to make false representations pertaining to "the character, amount, or legal status of any debt."

Liability for any § 1692e claim is assessed under the objective standard of the "unsophisticated consumer" or debtor. *Ruth v. Triumph Partnerships*, 577 F.3d 790, 800 (7th Cir. 2009); *Muha v. Encore Receivable Management, Inc.*, 558 F.3d 623, 627 (7th Cir. 2009) ("If a statement would not mislead the unsophisticated consumer, it does not violate the FDCPA- even if it is false in some technical sense."). *See also Evory,* 505 F.3d at 774 (7th Cir. 2007); *Turner v. J.V.D.B. & Assoc.*, 330 F.3d 991, 995 (7th Cir.2003). Although the unsophisticated consumer is "uninformed, naïve, or trusting," *Veach v. Sheeks*, 316 F.3d 690, 693 (7th Cir. 2003), he or she still has a "rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences." *Fields v. Wilber Law Firm, P.C.*, 383 F.3d 562, 564 (7th Cir. 2004) (internal quotations omitted). In short, the unsophisticated consumer is not a "dimwit." *Whal v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009).

Mr. Michell's description of the telephone conversation, which I have credited, is the factual backdrop for analysis of Ms. Nelson's claims. Mr. Michell requested Ms. Nelson's attorney's information and did not falsely represent the character or the legal status of the debt; nor did he create a false sense of urgency that the bill had to be paid immediately. In fact, on April 8 after the telephone call Mr. Michell removed Ms. Nelson's account from the active queue ensuring that that there would be no further automatic contact until Allan Michell followed upon the account pursuant to L & P's procedures. *(Tr. 395; 332)*. And, it bears repeating, that there was no further contact with Ms. Nelson. Given Mr. Michell's overall testimony – which I credit over Ms. Nelson's testimony – there was no FDCPA violation under §1692e, e(10) or e(2)(A).

## C.
### The Bona Fide Error Defense

Section 1692k(c) of the FDCPA provides a kind of built-in exemption from liability for debt collectors who can show "by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." L & P claims this defense as an alternative theory for evading liability under the Act. Their argument is essentially that the conduct alleged, if true, was the result of an unintentional mistake made notwithstanding proper training procedures and policies which L & P had implemented to prevent its employees from violating the FDCPA. *(Defendant's Post Trial Submission 15)*.

Since L & P is not liable for violations of the FDCPA, it is unnecessary to address the issue of whether it is entitled to the *bona fide* error defense. *See generally Jerman*, 130 S.Ct. at 1616; *See also Bassett v. I.C. System, Inc.*, --- F.Supp.2d ----, 2010 WL 2179175 (N.D. Ill. 2010) ("In connection with this claim, I.C. System does not argue that it committed a procedural or

clerical error. Instead, I.C. System makes its argument under the pre-*Jerman* paradigm and explains that it had procedures and policies in place to avoid any such errors.").

### D.
### Attorney's Fees and Bad Faith Under the FDCPA

Section 1692k of the FDCPA provides that, "on a finding by the court that an action under this section was brought in bad faith and for the purpose of harassment, the court may award to the defendant attorney's fees reasonable in relation to the work expended and costs." L&P makes no argument that Ms. Nelson's claims were brought in bad faith or with the intent to harass. Consequently, I decline to award attorneys' fees, even though I have found her claims to be without merit. *See Gorman v. Wolpoff & Abramson, LLP*, 433 F.Supp. 2d 1004, 1013 (N.D. Cal. 2006) (modified on other grounds, 584 F.3d 1147) (although the record was devoid of support for many of consumer's allegations, there was insufficient evidence that entire suit was filed in bad faith and for purposes of harassment); *Turner*, 330 F.3d at 774; *Perry v. Stewart Title Co.*, 756 F.2d 1197, 1211 (5th Cir. 1985) ("To recover attorney's fees under the FDCPA, the prevailing defendant must show affirmatively that the Plaintiff brought the FDCPA claim in bad faith and for the purpose of harassment."). While the weight of the evidence did not support Ms. Nelson's allegations, the court declines to award L & P attorney's fees or costs pursuant to § 1692k.

### IV.
### The Illinois Workers' Compensation Act Claims

Finally, Ms. Nelson contends that L & P's conduct violated the IWCA, 820 ILCS 305/8.2(e-5), (e-10), and (e-15). She seeks a declaratory judgment pursuant to 735 ILCS 5/2-

701. (*See Plaintiff's Complaint* ¶ 39).[14] The IWCA provides, in pertinent part, that "once an employee informs the provider that there is an application filed with the Commission to resolve a dispute over payment of such charges, the provider shall cease any and all efforts to collect payment for the services that are the subject of the dispute." 820 ILCS 305/8.2(e-5), (e-10).

Given that Mr. Michell's testimony is credited, the only conclusion here is that L & P did not engage in any of the activities proscribed by the Act. Prior to April 8, L & P did not know that the MIMIT debt related to a workers' compensation claim. After Ms. Nelson had appraised Mr. Michell of that fact during the phone conversation, there was no further attempt to collect the debt. And I have concluded that he did not repeatedly demand payment as she contends. It bears repeating that L & P has not once contacted her since the April 8 phone call, and Allan Michell testified that L & P totally closed her account in May 2008. (*Tr. 352*). The Plaintiff's IWCA claims are rejected. Accordingly, the request for a declaratory judgment is denied.

## POSTSCRIPT

In closing, I would be remiss not to note the outstanding lawyering in this case. Throughout the proceedings, Mr. Shapiro, counsel for the Plaintiff, and Mr. Foster, counsel for the Defendant, were cooperative, accommodating and courteous to each other. Their briefs were exceptional; they were thoughtful, carefully prepared, and well-supported by analysis and pertinent authority. Indeed, the briefs were among the best that I have seen. Both sides presented their respective cases with the highest degree of skill and professionalism.

---

[14] Ms. Nelson's complaint requested a declaratory judgment as well as injunctive relief. However, at the conclusion of the trial, Plaintiff's counsel stated that injunctive relief was no longer being sought since L & P had closed out Ms. Nelson's account in May 2008. (*Tr. 456-57*).

## CONCLUSION

For the reasons discussed above, judgment will be entered on all claims in favor of the

Defendant.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

DATE: 8/12/10